UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| MARLYNN SAEED, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | Civil Action No. 16-cv-11928-ADB |
| NANCY A. BERRYHILL,[1] | * | |
| *Commissioner of Social Security*, | * | |
| | * | |
| Defendant. | * | |

## MEMORANDUM AND ORDER

BURROUGHS, D.J.

Plaintiff Marlynn Saeed ("Ms. Saeed" or "Claimant") brings this action pursuant to

section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), challenging the final decision of

the Commissioner of the Social Security Administration (the "Commissioner") denying her

claim for Social Security Disability Insurance ("SSDI") benefits. Currently pending are

Claimant's motion to reverse the Commissioner's decision denying her disability benefits [ECF

No. 23], and the Commissioner's cross-motion for an order affirming the decision. [ECF No.

27]. For the reasons described herein, the Court finds that the decision of the Administrative Law

Judge ("ALJ") was not supported by substantial evidence and therefore VACATES the decision

of the Commissioner and REMANDS the case for further administrative proceedings consistent

with this opinion.

## I.      BACKGROUND

### A.      Statutory and Regulatory Framework: Five-Step Process to Evaluate
###         Disability Claims

---

[1] The original complaint was filed against Carolyn W. Colvin, but because Nancy A. Berryhill
became the Acting Commissioner of Social Security on January 23, 2017, she was automatically
substituted as the Defendant pursuant to Fed. R. Civ. P. 25(d).

"The Social Security Administration is the federal agency charged with administering both the Social Security disability benefits program, which provides disability insurance for covered workers, and the Supplemental Security Income program, which provides assistance for the indigent aged and disabled." <u>Seavey v. Barnhart</u>, 276 F.3d 1, 5 (1st Cir. 2001) (citing 42 U.S.C. §§ 423, 1381a).

The Social Security Act (the "Act") provides that an individual shall be considered to be "disabled" if he or she is:

> unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months.

42 U.S.C. § 1382c(a)(3)(A); <u>see also</u> 42 U.S.C. § 423(d)(1)(A). The disability must be severe, such that the claimant is unable to do his or her previous work or any other substantial gainful activity that exists in the national economy. <u>See</u> 42 U.S.C. § 1382c(a)(3)(B); 20 C.F.R. § 416.905.

When evaluating a disability claim under the Act, the Commissioner uses a five-step process, which the First Circuit has explained as follows:

> All five steps are not applied to every applicant, as the determination may be concluded at any step along the process. The steps are: 1) if the applicant is engaged in substantial gainful work activity, the application is denied; 2) if the applicant does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted; 4) if the applicant's "residual functional capacity" is such that he or she can still perform past relevant work, then the application is denied; 5) if the applicant, given his or her residual functional capacity, education, work experience, and age, is unable to do any other work, the application is granted.

<u>Seavey</u>, 276 F.3d at 5 (citing 20 C.F.R. § 416.920).

## B. Procedural Background

Claimant filed her application for SSDI benefits on April 19, 2013. [R. 12].[2] She alleged that she became disabled on April 19, 2013, due to carpal tunnel syndrome, obesity, and "multiple musculoskeletal disorders." [R. 12, 14, 195]. Her date last insured was June 30, 2016. [R. 12].

The Social Security Administration (the "SSA") denied Claimant's application for SSDI benefits on November 12, 2013, and again upon reconsideration on March 7, 2014. [R. 12]. Thereafter, Claimant requested an administrative hearing, and a hearing took place before ALJ Daniel J. Driscoll ("ALJ Driscoll") on May 27, 2015. [R. 12, 24]. Claimant, who was represented by counsel, appeared and testified at the hearing. [R. 12, 24]. On June 26, 2015, ALJ Driscoll issued a decision finding that Claimant was not disabled. [R. 19]. The SSA Appeals Council denied her Request for Review on August 10, 2016. [R. 1]. On September 23, 2016, she filed a timely complaint with this Court, seeking review of the Commissioner's decision pursuant to section 205(g) of the Act. [ECF No. 1].[3]

## C. Factual Background

Claimant was born in 1965 and was 50 years old when ALJ Driscoll issued his decision. [R. 18−19, 170]. She resides in Roxbury, Massachusetts with her sister and her niece. [R. 30–31]. She has a high school education and last worked in September 2014 as a cashier in the

---

[2] References to pages in the Administrative Record, which were filed electronically at ECF No. 16, are cited as "[R. __ ]."

[3] Claimant previously applied for SSDI and Supplemental Security Income ("SSI") benefits on April 20, 2010, alleging that she was disabled as of March 12, 2010. [R. 71]. The SSA denied her application on September 29, 2010, and again upon reconsideration on January 20, 2011. Id. On March 23, 2012, ALJ J. Alan Mackay ("ALJ Mackay") held an administrative hearing during which Claimant, who was represented by counsel, appeared and testified. Id. On April 11, 2012, ALJ Mackay issued a decision finding that Claimant was not disabled. [R. 82].

bakery department of a Stop and Shop. She previously held similar positions at Star Market, Shaw's supermarket, and Dunkin' Donuts. [R. 30−36].

### D.    Medical Evidence

Claimant has a long history of musculoskeletal impairment, reportedly dating back to an early diagnosis of carpal tunnel syndrome in 2004, as well as an injury to her left knee when she fell from a ladder in the summer of 2008.[4] [R. 75−76]. Following her knee injury, by September 2008, she was advised that she could return to work and use a high chair to take occasional breaks while attending to her duties as a cashier. [R. 76]. In the fall of 2009, Claimant's treatment began to focus on the impairment of her right foot, as she was diagnosed with right peritoneal tendinosis. [R. 76]. In March 2010, a large object fell onto and injured Claimant's right foot while she was working at Dunkin' Donuts, after which she was advised to use a medical boot. [R. 76]. She benefited from treating her right foot with injection therapy and the use of Voltaren gel in late 2010, but declined to participate in further injection therapy in early 2011, against the advice of her treating physicians. [R. 76−77]. In July 2011, Claimant was advised that she could continue to work with the limitation that she "should refrain from any high lifting."[5] [R. 77].

On May 22, 2012, Dr. Eric Bluman, M.D. and certified physician assistant ("PA-C") Samantha Noonan examined Claimant after a mop bucket rolled over her right foot at work. [R. 462]. Dr. Bluman determined that Claimant sprained her right foot and prescribed the use of a boot for four to six weeks. Id. On June 6, 2012, Claimant visited an urgent care clinic at Brigham

---

[4] With respect to Claimant's medical history predating the alleged onset date, the Court begins by summarizing the findings in ALJ Mackay's prior decision.

[5] ALJ Mackay also noted that the record contained some references to a left shoulder impairment but that there was little evidence of shoulder-specific treatment. [R. 77].

& Women's Hospital for another workplace injury after a large metal cage fell onto her right foot. [R. 315]. Although X-rays following this latest accident showed no evidence of a fracture or dislocation, [R. 329], Dr. Joseph Frank, M.D. advised Claimant to wear a brace with an ACE bandage wrap. [R. 314]. On July 2, 2012, Dr. Frank examined Claimant again but was hesitant to recommend that she avoid walking and stop working. [R. 312]. He contacted PA-C Noonan for a recommendation, and, on August 2, 2012, PA-C Noonan cleared Claimant to return to work without restrictions while she wore the brace. [R. 310].

On June 18, 2013, state-agency physician Dr. Sanjay Ram, M.D. completed a physical residual functional capacity ("RFC") assessment, finding that Claimant could (a) occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds; (b) stand and/or walk for at least two hours in an eight-hour workday; (c) sit for eight hours in an eight-hour workday; (d) frequently reach overhead and at the bench level; (e) frequently finger; (f) frequently feel; and (g) occasionally handle. [R. 409−10].[6]

On July 16, 2013, Dr. Lipika Samal, M.D. examined Claimant and noted that her thumb was still causing her pain, but that her "knee [was] better." [R. 289]. Claimant demonstrated a "much more normal gait" and a full range of motion in her upper and lower extremities, despite showing decreased strength when flexing her right foot. [R. 290]. One week later, on July 24, 2013, Claimant saw Dr. Kathryn Hanna, M.D. in the department of orthopedic surgery at Brigham & Women's Hospital regarding stiffness in her right thumb and middle finger. [R. 287]. Dr. Hanna assessed that Claimant had early trigger finger of the right thumb and middle finger and recommended corticosteroid injections, which Claimant declined. Id. Dr. Hanna determined

---

[6] As the Commissioner acknowledges, there is no indication whether Dr. Ram examined or treated Claimant, and he may have only reviewed her medical records. [ECF No. 28 at 4].

that surgery was unnecessary at the time and recommended stretching in the absence of an injection.[7] Id.

In late July and early August 2013, Dr. Jonathan R. Welch, M.D. and Nicole Kostarellas, PA-C in the emergency care unit at Brigham & Women's Hospital examined Claimant after she slipped and twisted her left knee at work. [R. 280, 284–85]. Dr. Welch concluded that she likely sprained her left knee and right middle finger and advised that she stay out of work for at least two weeks. [R. 279, 284]. On August 14, 2013, Dr. Samal examined Claimant concerning the same workplace injury and noted weakness in Claimant's right foot but no abnormalities, and that an MRI of her left knee showed osteoarthritis but no tears. [R. 276−77]. Dr. Samal determined that Claimant "should be able to go back to work when the pain decreases," and referred her to Dr. Spencer Stanbury, M.D. in the orthopedic surgery department. [R. 278]. Dr. Stanbury reviewed X-rays of Claimant's right middle finger and saw that there was "no acute fracture or dislocation" and that her bones were positioned within normal limits. [R. 460]. He also administered a corticosteroid injection in Claimant's right hand, but, on October 9, 2013, Claimant returned to Dr. Stanbury, complaining that the corticosteroid injection had not relieved her pain. [R. 274, 458, 460]. He conducted a physical examination and found that Claimant had mild swelling and stiffness of her middle finger, as well as some stiffness and locking in her thumb. [R. 458]. He ordered a nerve conduction study and prescribed the use of a wrist splint at night. Id.

On November 7, 2013, Dr. Jane Matthews, M.D. completed a RFC assessment of Claimant. [R. 84–91]. Dr. Matthews noted that X-rays of Claimant's middle finger showed no

---

[7] On July 24, 2013, Dr. Hanna also ordered X-rays of her hand which showed that "[s]keletal and joint architecture [was] intact and otherwise normal without erosions," that there was "[n]o significant abnormality," and that there was "no evidence of rheumatoid arthropathy." [R. 461].

fractures or dislocation and normal bone mineralization, and that X-rays of her knee showed osteoarthritis but no tears. [R. 87]. She also recognized that Claimant had received ibuprofen, ointment, and cortisone injections to address her pain "with moderate to good results." Id. In concluding that Claimant could perform light work, she determined that Claimant was subject to the following exertional limitations: (a) occasionally climbing (ramps, stairs, ladders, ropes, or scaffolds), balancing, stooping, kneeling, crouching, and crawling; (b) occasionally lifting and/or carrying 20 pounds and frequently lifting and/or carrying 10 pounds; (c) standing and/or walking for about six hours in an eight-hour workday; and (d) sitting for about six hours in an eight-hour workday. [R. 89]. Dr. Matthews found no manipulative limitations or limitations on her ability to push and/or pull. Id.

On November 26, 2013, Dr. Michael Rivlin, M.D. examined Claimant after electromyography ("EMG") and nerve conduction studies showed that she had moderate-severe bilateral carpal tunnel syndrome. [R. 332–33]. Dr. Rivlin assessed that Claimant's carpal tunnel syndrome was more symptomatic in her right hand than her left hand. [R. 332]. Claimant expressed to Dr. Rivlin that she did not want a cortisone injection to treat the pain in her hand but instead wanted to undergo a procedure to release her right carpal tunnel and middle finger. [R. 332]. Dr. Alison Kitay, M.D. performed a right carpal tunnel release and trigger finger release of the thumb and middle finger on June 3, 2014. [R. 449].

On February 19, 2014, which was prior to the carpal tunnel surgery mentioned above, state-agency reviewing physician Dr. Harold Ramsey, M.D. completed a RFC assessment of Claimant. [R. 102]. In finding that Claimant could perform light work, he assessed that she was subject to the following exertional limitations: (a) occasionally climbing ramps or stairs; (b) never climbing ladders, ropes, or scaffolds; (c) occasionally balancing, stooping, kneeling,

crouching, or crawling; (d) occasionally lifting and/or carrying 20 pounds and frequently lifting and/or carrying 10 pounds; (e) standing or walking for six hours in an eight-hour workday; and (f) sitting for six hours in an eight-hour workday. [R. 99–103]. He found that she was limited in bilateral handling and fingering due to her carpal tunnel syndrome, although he did not indicate how often she could perform such activities. [R. 100–01]. Dr. Ramsey indicated that Claimant's subjective pain had worsened since her previous RFC assessment in November 2013, but ultimately concluded that she was not disabled and could adjust to other work. [R. 103–04].

On February 17, 2015, Dr. Julie Balch Samora, M.D., Ph.D. examined Claimant for complaints related to right hand pain. [R. 439]. The numbness and tingling in Claimant's right hand "significantly improved" after the surgery, but she continued to experience stiffness and tightness in her right thumb and middle finger. Id. Although Claimant had some difficulty performing certain maneuvers with her right hand, Dr. Samora assessed that "all of her tendons and nerves are functioning" and ordered an MRI of the right hand, which ultimately revealed no fractures, dislocations, or erosions. [R. 438–39].

On May 27, 2015, Claimant testified at a hearing before ALJ Driscoll. [R. 24]. She stated that she has carpal tunnel syndrome in both hands, [R. 45], but also explained that she attends a community center twice per week to learn how to write with her left hand and started washing herself with her left hand.[8] [R. 38–40, 50]. She also testified that her left knee "pops" when she walks for five or 10 minutes and that her right foot drags, although the pain in her right foot has

_____

[8] Claimant testified that she scheduled another surgical procedure on her right hand to be performed four weeks after the hearing. [R. 41]. She also stated that her doctors were considering a procedure to release her left carpal tunnel. [R. 53]. There is, however, no indication in the record or briefing that she underwent any surgical procedure following the hearing.

somewhat subsided. [R. 43−45]. She also receives cortisone shots every six months, which has helped alleviate the pain in her left shoulder. [R. 45−46].

### E. Vocational Expert Testimony

Independent vocational expert ("VE") Christopher Wood also testified at the hearing before ALJ Driscoll. [R. 53–54]. The ALJ's first hypothetical presumed a person of Claimant's age, education, and work experience, who could perform work at a light level, subject to the following conditions: (a) standing and/or walking for up to two hours during the workday; (b) occasionally pushing/pulling with the right dominant upper extremity; (c) no operation of foot controls with the right lower extremity; (d) occasionally climbing ramps and stairs; (e) never climbing ropes, ladders or scaffolds; (f) occasionally balancing, crawling, stooping, kneeling, or crouching; (g) frequently fingering and handling with the right dominant extremity; (h) occasionally fully extending or reaching overhead bilaterally; and (i) avoiding extreme temperature or humidity, concentrated exposure to pulmonary irritants, vibration, and hazards such as moving machinery, unprotected heights, and slippery or uneven surfaces. [R. 56–57].

When asked whether such a person could perform Claimant's past work, the VE responded that such a person could not perform Claimant's past work but could work other jobs. [R. 57]. The ALJ asked him to identify light jobs that do not require standing or walking for more than two hours, and the VE named box office cashier/ticket seller as a light, unskilled job that generally includes a sit/stand option through the use of a high-back stool. [R. 58]. The VE identified parking cashier as another light, unskilled job that involves "minimal standing."[9] [R. 59].

---

[9] The VE also mentioned charge-account clerk as a sedentary, unskilled job. [R. 59].

In a second hypothetical, the ALJ adopted the vocational profile and limitations of the first hypothetical, with the exception that the person could only occasionally finger and handle with the right dominant upper extremity. [R. 59–60]. The VE identified surveillance system monitor as the only applicable unskilled, sedentary job.[10] [R. 59–60]. The ALJ then asked whether there were light jobs that a person described in the second hypothetical could perform. Id. The VE identified usher and hostess.[11] In a third hypothetical, the ALJ adopted the vocational profile and limitations of the second hypothetical, with the exception that this person could only rarely finger and handle with the right dominant upper extremity. [R. 60]. The VE stated that there were no jobs in the national economy that such a person could perform. Id.

Claimant's counsel expressed a concern that the VE was improperly characterizing jobs as light where the applicant was limited to a sedentary level of standing or walking. [R. 62]. The ALJ explained that "these categories are categories that include many factors. And some jobs may require you to lift, you know, more and stand less . . . [o]r vice-versa. And that's why we rely on the expertise of an expert in the field." Id. The ALJ then offered to address Claimant's counsel's concerns by directly questioning the VE. [R. 62−63]. He asked, "considering that a light job is typically a job[] that can be expected to have a stand and walk requirement of up to six hours in an eight-hour workday, and that the RFC that we're discussing in hypotheticals 1 through 3 is only a two-hour maximum of standing and walking, . . . my question is . . . whether there is any erosion of the [occupational base], due to that significant limitation in standing and

_____

[10] The Commissioner concedes that it cannot rely on the sedentary job of surveillance system monitor, because Claimant would have become legally disabled upon turning 50 years old if she were limited to unskilled, sedentary work. [ECF No. 28 at 8].
[11] The Commissioner also concedes that the VE was mistaken when he characterized the job of hostess as a light, unskilled job, as it is a light, semi-skilled job and is therefore inapplicable to Claimant's disability determination. [ECF No. 28 at 8].

walking?" [R. 63]. In response, the VE referenced box office cashier/ticket seller and opined that the two-hour standing/walking limitation would not erode the number of available jobs. Id. Based on his training and experience, he explained that theater venues always provide such employees with the option of using a high-back stool.[12] [R. 63−65].

## II.    ALJ DECISION

On June 26, 2015, ALJ Driscoll found Claimant was not disabled from the alleged onset date through the date of his decision. [R. 12–19]. At step one, he found that Claimant had not engaged in substantial gainful activity since the alleged onset date. [R. 13−14]. He next concluded that Claimant had the following severe impairments: carpal tunnel syndrome, obesity, and multiple musculoskeletal disorders, but that these impairments did not meet or equal the impairments in 20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526. [R. 14−15]. At step four, he determined that Claimant had the RFC to:

> perform light work as defined in 20 C.F.R. [§] 404.1567(b) except the claimant can stand and/or walk for a total of 2 hours during the course of an 8 hour workday, she can occasionally push and/or pull with her right upper extremity, she cannot operate foot controls with her right lower extremity, she can occasionally climb stairs and ramps, she can never climb ladders, ropes or scaffolds, she can occasionally balance, crawl, stoop, kneel or crouch, she can occasionally perform fine manipulations with her right dominant, upper extremity, she can occasionally perform gross manipulations with her right dominant, upper extremity, she can occasionally reach fully extended or overhead bilaterally, she needs to avoid temperature extremes, humidity, concentrated exposure or pulmonary irritants, such as fumes, dust, gases and chemicals, vibration and hazards, such as moving machinery, unprotected heights and slippery or uneven surfaces.

[R. 15]. Although the ALJ determined that Claimant could not perform her past relevant work, he concluded at step five that there were positions that exist in significant numbers in the national economy that Claimant could perform, including that of a surveillance system monitor,

---

[12] The VE also concluded that parking cashiers and charge-account clerks also have the option of using a high-back stool.

usher, and hostess. [R. 18]. Therefore, Claimant was found not disabled from April 19, 2013 through June 26, 2015. [R. 19].

## III.    STANDARD OF REVIEW

This Court has jurisdiction pursuant to section 205(g) of the Act, 42 U.S.C. § 405(g). Section 205(g) provides that an individual may obtain judicial review of a final decision of the Commissioner of Social Security by instituting a civil action in federal district court. See 42 U.S.C. § 405(g). The district court may take a number of actions with respect to the Commissioner's decision. First, under sentence four of section 205(g), the court has the power "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." Id. A court's decision under sentence four, however, can be based only on a review of the administrative record of proceedings before the Commissioner. See Whitzell v. Astrue, 792 F. Supp. 2d 143, 147 (D. Mass. 2011) (quoting 42 U.S.C. § 405(g)). If a claimant presents new evidence to the court that was not contained within the administrative record, the court may not consider it. "If additional evidence is to be considered, it must be by way of remand[]" pursuant to sentence six of Section 205(g). Hamilton v. Secretary of Health & Human Servs., 961 F.2d 1495, 1503 (10th Cir. 1992). Sentence six permits the court to remand a case to the Commissioner for further proceedings and order the evidence to be added to the record for consideration. See 42 U.S.C. § 405(g) ("The court may . . . at any time order additional evidence to be taken before the Commissioner . . . but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . .").

Under section 205(g), sentence four, this Court's review of the Commissioner's decision is "limited to determining whether the ALJ used the proper legal standards and found facts upon the proper quantum of evidence." Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000). In conducting such review, the Court must defer to the Commissioner's factual findings, so long as such findings are "supported by substantial evidence," but the court's review of the Commissioner's conclusions of law is de novo. Id. See also Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) ("The ALJ's findings of fact are conclusive when supported by substantial evidence . . . but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts."). Substantial evidence means "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). The Court "must affirm the [Commissioner's] resolution, *even if the record arguably could justify a different conclusion*, so long as it is supported by substantial evidence." Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987) (emphasis added) (citing Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 128 (1st Cir. 1981)).

## IV.     DISCUSSION

### A.     Prior ALJ's Decision

Claimant argues that ALJ Driscoll was bound by ALJ Mackay's prior RFC determination that Claimant could perform light work except that "she could stand or walk for less than two hours in an eight-hour workday." [R. 74]. In determining whether the second ALJ should be bound by the RFC finding of the prior ALJ, the Court considers "the length of time between the first and second applications . . . and whether the second ALJ considered significant new

evidence that demonstrated improvement in Plaintiff's condition." <u>Watkins v. Berryhill</u>, No. 16−30117, 2017 WL 4365158, at *13 (D. Mass. Sept. 29, 2017); <u>see</u> <u>Mantilla v. Colvin</u>, No. 15–11913, 2016 WL 3882838, at *5 (D. Mass. July 13, 2016) ("The crucial question in determining whether the ALJ in the second proceeding was bound by the RFC finding in the first proceeding is whether there was improvement in [claimant's] condition between the two decisions.").

Here, the prior ALJ's decision issued on April 11, 2012, covering the period from March 12, 2010 to April 11, 2012. [R. 73, 82]. Claimant filed the instant application asserting an alleged onset date of April 19, 2013. [R. 12]. Thus, the two applications cover separate periods of time, and the mere fact that Claimant did not have the RFC to perform a total of two hours of standing or walking "at the time of her first application is not conclusive evidence of her [RFC] at a later date." <u>Rucker v. Chater</u>, 92 F.3d 492, 495 (7th Cir. 1996); <u>see</u> <u>Albright v. Comm'r of Soc. Sec. Admin.</u>, 174 F.3d 473, 476 (4th Cir. 1999) ("The SSA treats a claimant's second or successive application for disability benefits as a claim apart from those earlier filed, at least to the extent that the most recent application alleges a previously unadjudicated period of disability."); <u>Watkins</u>, 2017 WL 4365158, at *13 (citing <u>Zavilla v. Astrue</u>, No. 09−133, 2009 WL 3364853, at *13 (W.D. Pa. Oct. 16, 2009) ("The Court is persuaded . . . that the doctrine of res judicata does not bind a subsequent ALJ to findings and decisions of an earlier ALJ when a claimant seeks benefits during a subsequent period of time.")); <u>Frost v. Barnhart</u>, No. 03−215, 2004 WL 1529286, at *3 (D. Me. May 7, 2004) ("when a claimant files a new application covering a new time frame, the issues (including RFC) are to be examined <em>de novo.</em>"). A significant gap of one year also separates the prior ALJ decision and Claimant's instant application, which further supports the reasonableness of ALJ Driscoll reaching a marginally different conclusion about Claimant's RFC. <u>See</u> <u>Watkins</u>, 2017 WL 4365158, at *13 (second ALJ not bound by first ALJ's

decision due to passage of almost one and one-half years after first ALJ's decision); cf. Mantilla, 2016 WL 3882838, at *6 (holding that RFC finding with respect to first application was entitled to "some res judicata consideration" where the second application was filed six months later).

Moreover, ALJ Driscoll substantially relied on medical evidence that arose after the issuance of the prior ALJ's decision.[13] X-rays that post-dated the prior ALJ's decision showed osteoarthritis in her left knee but no tears. [R. 87]. Dr. Samal examined Claimant on July 16, 2013 and noted that her knee was better and that she demonstrated a "much more normal gait" and a full range of motion in her lower extremities. [R. 289−90]. Dr. Matthews' RFC assessment of Claimant dated November 7, 2013 and Dr. Ramsey's RFC assessment dated February 19, 2014 both concluded that Claimant could stand and/or walk for about six hours in an eight-hour workday. See Rucker, 92 F.3d at 495 ("[T]he second ALJ considered [claimant's] disability status only for the period after . . . the date the Commissioner denied her first application. The hearing before the second ALJ, therefore, was not a 're-evaluation' of the evidence, but rather an independent consideration of her eligibility at the time of her second application. The time period was different, and a different outcome is not necessarily inconsistent."); Watkins, 2017 WL 4365158, at *13 (second ALJ considered prior ALJ's decision but concluded that he was "not bound by [the prior] findings," and reviewed "the evidence found in the current application's file," which included records that prior ALJ cited as well as new records); Trofimuk v. Comm'r of Soc. Sec., No. 12−2482, 2014 WL 794343, at *5 (E.D. Cal. Feb. 27, 2014) ("All of the medical evaluations considered by the ALJ in making her determination in the present case were

---

[13] Although ALJ Driscoll did not specifically mention ALJ Mackay's decision, he indicated at the outset of the hearing that "I was not involved with any prior determinations made in your case, and I'm not bound by them. I'll make a new and independent decision based on all the evidence in the record, including your testimony here today." [R. 26].

conducted after the prior favorable determination. Therefore, the ALJ based her determination entirely on new and material evidence and was not required to give the findings from the prior adjudication preclusive effect."). Finally, Claimant's argument is predicated largely on the distinction that the prior ALJ held that she could stand or walk for <u>less than</u> two hours in an eight-hour workday [R. 74], while ALJ Driscoll found that she could stand or walk for a <u>total</u> of two hours in an eight-hour workday. [R. 15]. Both the first and the second ALJ, nevertheless, reached the same conclusion that Claimant had the RFC to perform light work. Because of the significant passage of time, the lack of any overlap between the prior decision and the instant application, and the new evidence of improvement, ALJ Driscoll was not bound by the prior ALJ's RFC determination. Further, for these reasons, any slight difference between the two RFC determinations is both reasonable and inconsequential. <u>See, e.g.</u>, <u>Rucker</u>, 92 F.3d at 495 (citing <u>Hardy v. Chater</u>, 64 F.3d 405, 40 (8th Cir. 1995)) (prior ALJ determination was not binding where two ALJs made different findings about claimant's ability to perform certain levels of exertion but agreed on ultimate finding that claimant was not disabled).

## B. RFC and Step Five Determination

ALJ Driscoll found that Claimant could perform light exertional work as an usher, although her RFC was limited to two hours of standing or walking during an eight-hour workday. She challenges the ALJ's determination, asserting that a two-hour standing/walking limitation necessarily limits her RFC to sedentary work, and, for that reason, the ALJ's hypotheticals to the VE were also flawed.[14]

---

[14] Claimant also argues that the ALJ's RFC assessment should have limited her handling and fingering with respect to both hands (rather than only her right hand), thereby precluding her from working as a hostess. [ECF No. 23 at 4]. This argument is moot given that hostess is a semi-skilled position and is therefore inapplicable to Claimant. Assuming, *arguendo*, that Claimant applied this argument to the usher position, there is substantial evidence to support the

The applicable regulations describe "light work" as follows:

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b); 20 C.F.R. § 416.967(b). "Sedentary work" is defined as:

Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a); 20 C.F.R. § 416.967(a). In this context, the terms "frequent" and

"occasionally" are defined as follows:

"Frequent" means occurring from one-third to two-thirds of the time. Since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday. Sitting may occur intermittently during the remaining time. The lifting requirement for the majority of light jobs can be accomplished with occasional, rather than frequent, stooping. Many unskilled light jobs are performed primarily in one location, with the ability to stand being more critical than the ability to walk. They require use of arms and

---

ALJ's RFC determination that Claimant is limited to occasional handling and fingering with the right upper extremity, but is not similarly limited in her left upper extremity. Claimant testified that she was learning to write and wash herself with her left hand due to the significant limitations of her right hand. Dr. Rivlin reported that Claimant had carpal tunnel syndrome, confirmed by an EMG, in the "right more than the left" and that Claimant was "not symptomatic on the left" but showed clear evidence of carpal tunnel syndrome on the right. [R. 332]. Dr. Ramsey also indicated that although Claimant had bilateral carpal tunnel syndrome, it was on the "right more than left," [R. 98], whereas Dr. Matthews determined that Claimant had no manipulative limitations. [R. 89]. Although ALJ Driscoll may not have expressly referenced such evidence, he afforded significant weight to Dr. Matthews' and Dr. Ramsey's assessments. [R. 17].

hands to grasp and to hold and turn objects, and they generally do not require use of the fingers for fine activities to the extent required in much sedentary work.

"Occasionally" means occurring from very little up to one-third of the time. Since being on one's feet is required "occasionally" at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday. Work processes in specific jobs will dictate how often and how long a person will need to be on his or her feet to obtain or return small articles.

SSR 83–10. Where the claimant's exertional level falls between light and sedentary, and the exertional level determination may be dispositive of whether claimant is found disabled, the ALJ should consider the following:

a. An exertional capacity that is only slightly reduced in terms of the regulatory criteria could indicate a sufficient remaining occupational base to satisfy the minimal requirements for a finding of "Not disabled."

b. On the other hand, if the exertional capacity is significantly reduced in terms of the regulatory definition, it could indicate little more than the occupational base for the lower rule and could justify finding of "Disabled."

c. In situations where the rules would direct different conclusions, and the individual's exertional limitations are somewhere "in the middle" in terms of the regulatory criteria for exertional ranges of work, more difficult judgments are involved as to the sufficiency of the remaining occupational base to support a conclusion as to disability. Accordingly, [vocational specialist] assistance is advisable for these types of cases.

SSR 83–12. See Spalke v. Berryhill, No. 16–10856, 2016 WL 10720160, at *10 (D. Mass. Sept. 20, 2017) (citing SSR 83–12) ("Where a claimant is not capable of performing the full range of a category of work, a vocational expert should be consulted to clarify the implications of the claimant's RFC for the occupational base."); Aho v. Soc. Sec. Admin. Comm'r, No. 10–40052, 2011 WL 3511518, at *11 (D. Mass. Aug. 10, 2011) (where claimant could "perform most of the requirements for light exertional work," but her capacity to stand/walk was less than the required amount for light work, ALJ properly "consulted a vocational expert to determine what light exertional jobs were available to plaintiff that allow a sit/stand option"); Gross v. Colvin, 213 F.

Supp. 3d 229, 234 (D. Mass. 2016) (where claimant's RFC fell between light and sedentary, in part due to a two-hour limitation on standing/walking, "SSR 83–12 advise[d] the ALJ [to] use a vocational expert to determine the impact the reduced exertional capacity has on the occupational base").

Here, given that Claimant had the ability to perform certain requirements of light work but also had limitations below that exertional level, the ALJ properly opted to consult the VE in accordance with SSR 83−12. All three hypotheticals posed by the ALJ included a two-hour standing/walking limitation, and Claimant's counsel specifically asked that the VE clarify that the jobs he selected took into account the two-hour standing/walking limitation. [R. 61−62]. See O'Bannon v. Colvin, No. 13−207, 2014 WL 1767128, at *9 (D. Me. Apr. 29, 2014) (where "the four-hour limitation was included in the hypothetical question posed to the vocational expert, the [ALJ] was entitled to rely on her response as including that limitation and as being based on her training, education, and experience"). The VE considered the two-hour standing/walking limitation when he identified the light level job of usher, but he did not address whether a high-back stool is available to an usher, as opposed to a box office cashier/ticket seller.[15] [R. 58, 63].

---

[15] The Court rejects Claimant's argument that the VE's testimony regarding the availability of a high-back stool constitutes a "reasonable accommodation" under the Americans with Disabilities Act. Claimant failed to address this argument at the hearing and therefore waived it. See Mills v. Apfel, 244 F.3d 1, 8 (1st Cir. 2001); Bonner v. Colvin, 153 F. Supp. 3d 465, 477 (D. Mass. 2015) ("[H]aving failed to object during the administrative hearing, [claimant] has waived" argument). Notwithstanding the waiver, her argument fails because the VE's testimony addressed jobs with "pre-existing accommodations to suit [Claimant's] sit/stand option" rather than jobs that would require a reasonable accommodation to be made specifically for Claimant. Ramirez v. Soc. Sec. Comm'r, No. 14–01176, 2015 WL 5544501, at *4 (E.D. Cal. Sept. 18, 2015); see also Loop v. Colvin, 651 Fed. App'x 694, 696 (9th Cir. 2016) (explaining that claimant's argument that the VE's testimony required inference of a reasonable accommodation lacked merit "because the gist of the [VE's] testimony was that allowing a sit/stand option is commonplace in [the relevant workplaces], and this is how the [relevant job] is generally performed in the national economy"); Jones v. Apfel, 174 F.3d 692, 693–94 (5th Cir. 1999) (holding that ALJ properly relied on VE's

Although neither party has specifically addressed this concern, the ALJ did not appear to consider, either in his decision or in posing the hypotheticals to the VE, that an RFC incorporating a two-hour standing/walking limitation but otherwise adopting the capacity to perform light work presents a potential inconsistency. As set forth in the regulations, light work "involves lifting no more than 20 pounds at a time with frequent (1/3 to 2/3 of an 8 hour work day) lifting or carrying of objects weighing up to 10 pounds. Thus, someone who can perform light work must be able to lift and carry 10 pounds for 2.67–5.33 hours per day. By logical extension, light work requires a person to be on their feet for 2.67–5.33 hours in a day, while lifting and carrying up to 10 pounds in that time." Wilkerson v. Comm'r of Soc. Sec., No. 16−11153, 2017 LEXIS 161196, at *35 (E.D. Mich. Aug. 22, 2017), report and recommendation adopted, 2017 LEXIS 159677 (E.D. Mich. Sept. 28, 2017). A two-hour standing/walking limitation therefore appears to contradict a finding that a claimant can lift or carry at a light work level.[16] Id.

---

testimony indicating that allowing for employee to alternate between sitting and standing is a prevalent accommodation in the relevant workplace).

[16] Courts in other jurisdictions have reached different results when presented with the same or similar type of inconsistency. Compare Campbell v. Astrue, No. 09–5356, 2010 WL 4689521 (E.D. Pa. Nov. 2, 2010) (remand based in part on "inherent contradiction" between ALJ's finding that claimant could frequently lift 10 pounds but could stand or walk no more than one to two hours); and Ferdin v. Colvin, No. 15−29, 2015 WL 7767980, at *11 (W.D. Tex. July 30, 2015) (following Campbell); and Ford v. Colvin, No. 14−01046, 2015 WL 4608136, at *8 (D. Del. July 31, 2015) (same); with Jones v. Comm'r, Soc. Sec. Admin., No. 16−936, 2017 WL 627383, at *2 (D. Md. Feb. 15, 2017) (rejecting Campbell and finding that ALJ properly considered VE testimony to determine claimant could perform light work with a two-hour standing/walking limitation); and Nino v. Berryhill, No. 17−100, 2018 WL 889454, at *3 (N.D. Tex. Jan. 29, 2018), adopting report and recommendation, 2018 WL 895601 (W.D. Tex. Feb. 13, 2018) (affirming where ALJ emphasized to the VE that claimant had a two-hour standing/walking limitation); and Wiggins v. Berryhill, No. 16–3991, 2017 WL 1532038, at *7 (E.D. Pa. Feb. 24, 2017), adopting report and recommendation, 2017 WL 1493279 (E.D. Pa. Apr. 26, 2017) (ALJ properly found claimant could perform "a reduced range of light work" where he had a two-hour standing/walking limitation).

Here, the ALJ did not specifically address Claimant's ability to lift/carry, but determined that Claimant was capable of performing light work unless otherwise indicated, creating a potential conflict between her lift/carry capacity and her standing/walking limitation. He also limited Claimant to occasional pushing and/or pulling with the right upper extremity, and found that she had no capacity to operate foot controls with her right lower extremity. See 20 C.F.R. § 404.1567(b) (light work jobs generally require "a good deal of walking or standing" or involve "sitting most of the time with some pushing and pulling of arm or leg controls"). That Claimant may be precluded from performing light work jobs that involve sitting for most of the time raises additional cause for concern for whether the ALJ's RFC determination is justified in the absence of further explanation or VE testimony. Cf. Freeman v. Colvin, No. 15−216, 2016 WL 697140, *5 (E.D. Tenn. Feb. 19, 2016) (ALJ properly determined that claimant could perform light work despite two-hour standing/walking limitation, where claimant's ability to "lift, carry, push, or pull" did not fall outside of the requirements of light work and no indication that she could not perform such activities from a seated position).

The Court does not hold that a two-hour standing/walking limitation necessitates a RFC of sedentary work, or that the mere inconsistency between such a standing/walking limitation and a lift/carry capacity requires a remand. See Gross, 213 F. Supp. 3d at 234 (ALJ properly considered VE testimony where claimant's RFC fell between light and sedentary due to a two-hour standing limitation, but remanding for insufficient testimony by the VE); Aho, 2011 WL 3511518, at *12 (no error where ALJ sought testimony from VE to determine what light jobs allow a sit/stand option). Under the particular circumstances of this case, however, remand is the better course to ensure that there is substantial evidence concerning Claimant's exertional level, which may be outcome dispositive given her age. See Wilkerson, 2017 LEXIS 161196, at *45

(remand necessary where RFC finding would determine whether claimant was disabled or not given her age); Franklin v. Berryhill, No. 16−2284, 2017 WL 2080196, *11 (M.D. Pa. 2017) (preferable to remand where the exertional level determination may be dispositive of the case). Although the ALJ and the VE may have implicitly accounted for Claimant's lift/carry capacity in concluding that she can work as an usher, remand will provide an opportunity for the ALJ to explicitly seek more detailed testimony regarding the usher position in relation to Claimant's limitations, as the VE did not specifically address the availability of a sit/stand option for an usher. Cf. Nino v. Berryhill, No. 17−100, 2018 WL 889454, at *7 (N.D. Tex. Jan. 29, 2018), adopting report and recommendation, 2018 WL 895601 (W.D. Tex. Feb. 13, 2018) (affirming Commissioner's decision where VE stated that three light work jobs he identified would allow "an individual to work off a stool to work" (internal quotation marks and citation omitted)). The VE may also provide additional clarity as to the impact of Claimant's two-hour standing/walking limitation on the occupational base. See Gross, 213 F. Supp. 3d at 233−34 (remanding where claimant's RFC had two-hour standing/walking limitation, but it was not clear "what methodology [vocational expert] used to account for the reduced exertional capacity of [claimant]"). Given these particular circumstances, the Court does not find that substantial evidence supports the ALJ's RFC and step 5 determinations.

V.      **CONCLUSION**

For the reasons stated herein, the Court finds that the ALJ's decision was not supported by substantial evidence and therefore <u>DENIES</u> the Commissioner's motion to affirm [ECF No. 27] and <u>GRANTS</u> the Claimant's motion to reverse or remand [ECF No. 23]. The decision of the ALJ is <u>VACATED</u>, and the case is <u>REMANDED</u> for further administrative proceedings consistent with this opinion.

**SO ORDERED.**

March 9, 2018                                          /s/ Allison D. Burroughs
                                                       ALLISON D. BURROUGHS
                                                       U.S. DISTRICT JUDGE